IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

United States of America

    v.                                  Case No. 2:18-cr-111

James A. Imes

OPINION AND ORDER

    By judgment entered on July 29, 2019, defendant was sentenced to terms of incarceration of 120 months on Count 1, operating a chop shop in violation of 18 U.S.C. §2322, Count 2, trafficking in motor vehicle parts with falsified, altered or removed numbers in violation of 18 U.S.C. §2321, and Count 3, altering or removing motor vehicle identification numbers in violation of 18 U.S.C. §511. Defendant was also sentenced to a term of incarceration of 60 months on Count 4, the knowing venting of HCFCs into the environment in violation of 42 U.S.C. §7413. The judgment specified that all terms of incarceration would run concurrently. Defendant was also sentenced to four 3-year terms of supervised release, to run concurrently. Defendant's proposed release date is May 17, 2027. See https://www.bop.gov/inmateloc/ (last visited December 17, 2020).

    On October 21, 2020, defendant, through counsel, filed a motion for a sentence reduction (compassionate release) under 18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act of 2018, citing the risks posed by the COVID-19 pandemic in light of defendant's medical conditions. See Doc. 51. The government filed a response on November 16, 2020. Doc. 53. The government agreed that defendant had exhausted his administrative remedies, but argued that this court should defer to the process of the Bureau of Prisons ("BOP") for determining eligibility for release on home

confinement under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), §12003(b)(2). The government further argued that defendant failed to show an extraordinary and compelling reason to release him due to his medical conditions, and that the statutory factors in 18 U.S.C. §3553(a) weigh against defendant's early release. Defendant filed a reply. See Docs. 54, 57 and 58. The court will now consider defendant's motion.

I. Standards for Compassionate Release

Under 18 U.S.C. §3582(c)(1)(A)(i), the court can reduce a sentence under §3582(c)(1)(A) if the court finds that "extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. §3582(c)(1)(A)(i). The court must also consider the factors set forth in 18 U.S.C. §3553(a) to the extent that they are applicable. §3582(c)(1)(A).[1] District courts may deny relief under §3582(c)(1)(A) based upon the court's discretionary balancing of the §3553(a) factors even if extraordinary and compelling reasons would otherwise justify relief. United States v. Ruffin, 978 F.3d 1000, 1008 (6th Cir. 2020). If, after weighing the §3553(a) factors, the court decides that the motion is well taken, the court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions

---

[1] Section 3582(c)(1)(A) further provides that the court must find "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. §3582(c)(1)(A). However, the Sixth Circuit has held that the policy statement contained in United States Sentencing Guidelines §1B1.13 do not apply to cases in which an inmate files a motion for compassionate release, and that district courts have full discretion to define "extraordinary and compelling" without consulting the policy statement. See United States v. Jones, 980 F.3d 1109, 1111 (6th Cir. Nov. 20, 2020).

that does not exceed the unserved portion of the original term of imprisonment)[.]" §3582(c)(1)(A). The grant of compassionate release is at the discretion of the court. United States v. Kincaid, 802 F. App'x 187, 188 (6th Cir. 2020).

II. Defendant's Request for Release

Defendant cites the dangers posed by COVID-19 to the inmate population. However, §3582(c)(1)(A) "does not constitute a get-out-of-jail card." United States v. Brady, S2 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020). Rather, "compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry ... made in the 'unique circumstances' and 'context' of each individual defendant." Id., citing United States v. Shakur, No. 82 CR 312 (CSH), 2020 WL 1911224, at *1 (S.D.N.Y. Apr. 20, 2020) and United States v. Hart, 17 Cr. 248 (VSB), 2020 WL 1989299, at *6 (S.D.N.Y. Apr. 27, 2020)).

Defendant argues that he has a serious risk from COVID-19 due to his medical conditions. Defendant is 59 years old. He first notes his obesity. His weight has varied over time. On October 9, 2019, defendant was reported as being 72.8 inches tall and weighing 369 pounds. Doc. 57, p. 22. As of August 6, 2020, defendant's weight was recorded at 386 pounds. Doc. 58, p. 104. His body mass index has been reported at BMI 46.2. Doc. 58, p. 208. According to the Centers for Disease Control ("CDC"), persons with severe obesity, that is, a body mass index greater than 40kg/m, are at an increased risk of severe symptoms if they contract COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity (last visited December 18, 2020). However, the medical records do not

report any adverse physical problems specifically linked to the defendant's weight. See United States v. Tranter, 471 F. Supp.3d 861, 865 (N.D. Ind. July 8, 2020)(noting that BMI is "a notoriously blunt tool" with clinical limitations, including its inability to differentiate between excess fat, muscle and bone mass, and that defendant had not identified any current medical issues resulting from his obesity, indicating that it has little adverse effect on his overall health). No physical limitations were noted, and defendant has no work restrictions. Doc. 57, p. 45. He is currently assigned to the grounds maintenance crew, and his work duties include operating a farm tractor and riding mower, using a weed eater, and blowing and picking up litter, limbs, twigs and branches. Doc. 54-1.

Defendant relies on his status as a former smoker. The CDC has reported that being a current or former smoker increases the risk of severe illness from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#smoking (last visited December 18, 2020). The presentence investigation report ("PSR") dated August 31, 2018, notes defendant's statement that he had not smoked for 5 years. There is no evidence that defendant has smoked since being confined in a federal institution in 2014. See Brooks v. Menifer, No. CV07-0131-A, 2009 WL 6006283, at *6 (W.D. La. Sept. 25, 2009)(noting that the BOP adopted a no-smoking policy making all BOP facilities smoke-free environments as of March 1, 2006).

The medical records contain no report of any adverse physical symptoms which defendant is currently experiencing or has

4

experienced in the past due to his smoking. In October of 2019, defendant denied having any respiratory problems, and his respiratory system was noted to be within normal limits, with clear lungs. Doc. 57, pp. 11, 24, 49, 62. In Tranter, 471 F.Supp. 3d at 865, the court rejected defendant's argument that his status as a former smoker placed him at increased risk, noting that defendant had identified no adverse health effects resulting from his smoking past and that, according to the CDC, his risk of disease from smoking dropped every day he remained smoke-free)(citation omitted).

Defendant refers to a history of heart disease. Although defendant reported that his father and mother had heart disease, the medical records fail to indicate that defendant himself has a history of heart disease. During an examination on October 8, 2019, defendant denied having any cardiovascular problems. Doc. 57, p. 11. His cardiovascular system was found to be within normal limits. Doc. 57, p. 24. A chest x-ray on October 29, 2019, revealed that his heart size was normal to borderline enlarged, with no venous congestion, no acute cardiopulmonary disease, and no evidence of congestive heart failure. Doc. 57, p. 62. a cardiovascular exam on May 13, 2020, revealed a regular rate and rhythm with normal S1 and S2. Doc. 58, p. 63.

Defendant does have a history of high blood pressure. According to the CDC, persons with high blood pressure might have an increased risk of severe symptoms with COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 18, 2020). However, the medical records indicate that

5

this condition appears to be well managed with prescription medication. The records contain no indication that defendant's blood pressure is dangerously high. On August 6, 2020, defendant reported that he misses taking the blood pressure medication because he is overly cautious about taking medications. Doc. 58, p. 2. This suggests that defendant does not experience severe symptoms which would motivate him not to skip his blood pressure medication.

The medical records also document defendant's laporascopic surgery to repair a ventral hernia in May of 2020. See Doc. 58. These records reflect that there were no complications during surgery. Doc. 58, p. 208. With the exception of a small infected area which had to be drained on June 18, 2020, and was successfully treated with antibiotics, the incision was well healed. Doc. 58, pp. 70, 145, 160. Defendant recovered to the extent that he is now assigned to a grounds maintenance work crew. Doc. 54-1.

Defendant relies on the presence of COVID-19 in the prisons. However, the BOP does not report any cases of COVID-19 at Montgomery RRM, where defendant is currently housed. See https://www.bop.gov/coronavirus (last visited December 18, 2020). Further, the BOP has taken steps to address the COVID-19 emergency. Early in the pandemic, the BOP implemented a modified operation plan. See https://bop.gov/coronavirus/covid19-status.jsp (last checked December 18, 2020). Under this plan, social visits at the institutions are precluded, inmate internal movement has been suspended, staff travel and training has been suspended, enhanced health screening of staff has been implemented, newly arriving inmates are processed through quarantine or jail/detention sites

6

and are screened for COVID, asymptomatic inmates with exposure to risk factors are quarantined, and symptomatic inmates with exposure risk factors are isolated and tested. One example of BOP measures to address the pandemic is found in a record which documents that when defendant was released from the hospital following his hernia surgery and returned to the institution, he was held in quarantine for a period of time, where he was monitored for signs of COVID-19 symptoms and given a COVID-19 test. Doc. 58, p. 36.

Upon his release, defendant plans to reside with his mother in Galloway, Ohio, which is located in Franklin County, Ohio. The Ohio Department of Health reports that as of December 18, 2020, there have been 72,561 COVID-19 cases in Franklin County, and 1,615 cases in the zip code where Galloway is located. See https://www.coronavirus.ohio.gov (last checked December 18, 2020).[2] The defendant's risk of infection may be less in prison than the risk he would face if he is released to the community.

Defendant's medical conditions, viewed individually and cumulatively with the potential risks of COVID-19, do not constitute an "extraordinary and compelling reason" for his early release.

### III. §3553(a) Factors

The court is also required to consider the relevant factors in §3553(a). These were serious offenses. The statutory maximum penalty for Count 1 was 15 years, and the statutory maximum penalty

---

[2] This court can take judicial notice of the records of state agencies. See Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861, 866 n. 1 (9th Cir. 2004)(citing Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1064 n. 7 (9th Cir. 1988)(state health department records were properly judicially noticed)).

7

for Counts 2 and 3 was 10 years. In calculating defendant's guideline range, the probation officer applied enhancements for being a leader or organizer of five or more persons, using his son, who was less than 18 years of age at that time, to assist in committing the offense, and obstruction of justice. The guideline range in defendant's case was 121 to 151 months. The court could have imposed a higher sentence on Count 1, but imposed the more lenient sentence of 120 months on Counts 1, 2 and 3.

As to the history and characteristics of the defendant, the defendant had prior convictions for theft in 1990, contributing to the delinquency of a minor in 1991, and criminal mischief and theft in 1997, which were assigned no criminal history points. He was also convicted of receiving stolen property in 2001, unauthorized use of property in 2005, and escape in 2006. This resulted in a criminal history score of 6 points, at the upper end of the range for Criminal History Category III.

The PSR reported that defendant was one of 20 children. His parents were alcoholics, and defendant witnessed acts of violence committed by both parents. At the time of sentencing, defendant was married to Tina Imes and had three children with her. Defendant began using alcohol and marijuana at age 13. He has a history of using cocaine and hallucinogens. He has a GED and was self-employed prior to his conviction in this case.

The government argues that the seriousness of the offense conduct weighs against the defendant's early release. According to the PSR, the criminal extensive activity in this case occurred over a substantial period of time, from January, 2013, through April, 2014. Defendant and other co-conspirators dismantled at least 35

motor vehicles and advertised the parts in cities in six states. Defendant rented garage space at three locations. These spaces were disguised as diesel mechanic shops, but were used to dismantle the stolen trucks. Defendant earned between $10,000 and $15,000 per week operating this enterprise. At least 29 individuals and/or companies suffered financial loss as a result of this scheme, resulting in a restitution obligation of $549,627.52.

The court continues to believe that the sentence of 120 months imposed in this case, a lenient sentence slightly below the guideline range, is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. At this point, defendant has served approximately 24 months of this sentence, only 20 percent of the sentence imposed. Releasing defendant now would result in a substantially shortened sentence which would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment.

The shortened sentence sought by defendant would also not afford adequate deterrence or protect the public from more crimes by the defendant. Defendant notes that he is permitted to go beyond the prison grounds as part of his job with the landscape maintenance crew. He argues that he would not pose a danger to the public if he is released on home confinement under the supervision of a probation officer.

However, the defendant's prior record contains multiple examples of defendant's poor adjustment while under supervision. The PSR reveals that defendant's probation for the 1990 theft charge was extended one year. A probation violation report was filed while he was on supervision as a result of his 1997 criminal

9

mischief conviction when he left the county without permission and failed to maintain contact with the probation officer. A violation petition was also filed in connection with his 1997 theft conviction, and he failed to report for the revocation hearing. Defendant was declared to be an absconder in connection with his probation following his 2001 receiving stolen property conviction when he failed to report and engaged in new criminal conduct. After his probation was restored, new violations were filed and he was again found to be an absconder. Regarding his 2005 conviction for unauthorized use of property, a request for revocation of probation was filed after defendant was absent without leave from a community correctional facility.

Finally, while defendant was on bond awaiting sentencing in the instant case, the government filed a motion to revoke defendant's bond after receiving information that defendant continued to commit theft offenses, specifically, the theft of a Ford truck, a lawn blower, a van and tools. Defendant failed to appear at the bond revocation hearing, and a warrant was issued for his arrest. This history of noncompliance with the conditions of supervision and release raises serious questions as to whether supervision by a probation officer would adequately protect the public from future crimes by the defendant if he is released early. Releasing defendant on a new term of supervised release, with a condition of location monitoring, until his projected release date of May 17, 2027, would severely tax the resources of the court's probation office.

Defendant notes that the offenses of conviction were not violent offenses, and that he has no prior convictions for crimes

10

of violence or drug offenses. However, the PSR includes defendant's report to the probation officer that he was stabbed nine times during an altercation while in jail and three times during a street fight, and that he was shot on four different occasions during verbal confrontations and altercations with known and unknown individuals.

Defendant also has a long history of substance abuse. Although the court recommended to the BOP at the time of sentencing that the defendant participate in the RDAP program and included substance abuse and mental health treatment as conditions of defendant's supervised release, the court has no evidence that defendant has received any substance abuse or mental health counseling while incarcerated.

The court concludes that the §3553(a) factors warrant denying defendant's motion for a reduced sentence. Even assuming, <u>arguendo</u>, that defendant's health conditions are sufficient to constitute an "extraordinary and compelling reason" for a sentence reduction, that reason is outweighed by the statutory factors which militate against defendant's early release.

<u>IV. Conclusion</u>

In accordance with the foregoing, defendant's motion for compassionate release (Doc. 51) is denied.

Date: December 22, 2020        s/James L. Graham
                               James L. Graham
                               United States District Judge

11